Mae A. Cameron, Respondent, v. Massachusetts Protective Association (Masonic Protective Association), Appellant.

Kansas City Court of Appeals.   June 29, 1925.

1.—Insurance—Death Not Caused Through Accidental Means Where no Mischance, Slip or Mishap Occurs by Doing Intentional Act. Where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, and no mischance, slip or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means.

2.—Same—In Lancing Pimple Unintentional Use of Instrument Having Thereon Poison Germs, Which Brought on Pneumonia Causing Death, Held an Accident Within Meaning of Insurance Policy. Where insured in lancing pimple on his arm unintentionally used an instrument having thereon poison germs, thereby inserting such germs into his system, causing pneumonia, from which he died, held death was result of accident within meaning of policy.

3.—Same—Provision Excepting Death by Disease Did Not Preclude Recovery for Death from Pneumonia Caused by Accidental Introduction of Germs Into System of Deceased. Provision "that this policy does not cover death due to disease, whether acquired accidentally or otherwise," construed to mean that insurer was not liable for death due to disease acquired accidentally save through "bodily injuries effected directly and independently of all other causes by accidental means," and as so construed held not to preclude recovery where death from pneumonia caused by unintentional use of instrument having thereon poison germs introduced into system in lancing pimple.

4.—Courts—Where Constitutional Question Not Called to Attention of Trial Court it Was Not in Case and There Was no Error in Refusing to Allow Appeal to Supreme Court. In action on accident insurance policy where constitutional question, urged by defendant, as to whether trial court gave full faith and credit to laws of Massachusetts as provided by section 1, of article 4, Constitution of United States, was not called to attention of trial court, there was no constitutional question in case and no error in refusing appeal to Supreme Court.

5.—Insurance—Instruction as Whether Death Caused by Unintentional Introduction of Germs Into System of Deceased Held Not Erroneous. Contention of defendant that plaintiff's instruction was erroneous in that it did not require jury to find that introduction of deadly germs by means of cut was an accidental injury due to external, violent and involuntary causes, but that accidental means causing death was the cutting or lancing of pimple, and also that instruction erroneously submitted to jury whether insured died as result of cut or injury when evidence showed he died from pneumonia, held without merit and hypercritical.

6.—Same—Refusal of Instruction That if Insured Died of Lobar Pneumonia Verdict Should be for Defendant, Held Not Error. Court did not err in refusing to give defendant's instruction to effect that if insured died of lobar

pneumonia verdict should be for defendant, where evidence showed death from lobar pneumonia brought about by germs unintentionally inserted into arm when insured cut pimple.

**7.—Same—Instruction That if Germs Caused Blood Poisoning and Blood Poisoning Resulted in Pneumonia Causing Death, Verdict Should be for Defendant, Properly Refused.** An instruction that although germs were introduced into insured's system by instrument used in cutting pimple, and such germs caused blood poisoning and blood poisoning weakened physical resistance of insured resulting in pneumonia, and in his death from pneumonia, verdict should be for defendant, was properly refused.

**8.—Pleading—Court Properly Permitted Plaintiff to Amend Petition After Judgment to Pray for Interest.** Where plaintiff was permitted to amend her petition after judgment to pray for interest, which jury had allowed, **held** not error under section 1277, Revised Statutes 1919.

---

*Corpus Juris-Cyc. References: Accident Insurance, 1CJ, p. 432, n. 13; p. 430, n. 96; p. 452, n. 27; p. 513, n. 60; p. 514, n. 63. Courts, 15CJ, p. 1083, n. 69. Pleading, 31Cyc, p. 405, n. 46.

Appeal from the Circuit Court of Saline County.—Hon. Ralph Hughes, Special Judge.

AFFIRMED.

*Rich, Storts & Rich* for respondent.

*Lathrop, Morrow, Fox & Moore, Geo. J. Mersereau* and *Richard S. Righter* for appellant.

BLAND, J.—This is an action by the beneficiary under an accident insurance policy to recover for the death of her husband, Carl C. Cameron, the insured. There was a verdict and judgment in favor of plaintiff in the sum of $5788.50 and defendant has appealed.

The facts show that on the 25th day of August, 1921, the insured, a railway conductor employed by the Chicago & Alton Railroad Company, left Slater on a freight run to Booth, a short distance east of Slater; on that evening and also on the next morning, August 26th, insured's brakeman observed on the former's left forearm a small pimple or lump about the size of a lead pencil rubber. At that time there were no cuts upon the arm. The insured was "mashing it and rubbing it and fooling with it;" "he kept fooling with it, squeezing it." On the afternoon of August 27th the two made the same run and the brakeman again observed the lump on insured's arm but saw a change in it in that there was a cut "clean through the pimple." The cut seemed to be "a quarter to

a half an inch long" and "on the level with the base of the arm;" the pimple was red and seemed to be inflamed, "it was more inflamed than it was before . . . and seemed to be sore;" "it apparently had been opened." At Booth insured bathed his arm in warm water and it was paining him "pretty bad." The brakeman wrapped the arm up with a "first aid" bandage. They left Booth about 4:30 A. M. Sunday, the 28th, and on the way back the insured struck his arm against the side of a coal car causing him to nearly faint. Insured went into the caboose and laid down; the brakeman again bound up the arm as striking the car had made it bleed. Insured remained lying down in the car until they reached Slater.

On the evening of the last-mentioned day insured went to the office of Dr. Duggins, a physician of Slater. Dr. Duggins examined the arm and observed a lump or pimple thereon which was inflamed and had thereon two lateral cuts that did not go through the skin. Another cut in the top of the pimple apparently had been made by sticking a knife or other sharp instrument into it to a depth of approximately one-sixteenth of an inch. The doctor told the insured to go home and apply hot applications. Insured complied with this direction but obtained no relief and was unable to resume work. Either on Monday or Tuesday, the 29th or 30th of August, insured again called at Dr. Duggins' office and at this time the arm looked "angrier" than it had on the previous visit, it was more swollen and more red. The doctor directed insured to continue the hot applications and stated that he would open the place as soon as "it was indicated." Insured continued to grow worse and on Thursday morning Dr. Duggins was called to insured's home and found him critically ill. The inflammation was greater and insured was suffering excruciating pain. He had cold sweats and chills, had pain in the arm and shoulder and there was some pain in the lower part of the right lung; his nervous system was "overwhelmed" and he was desperately ill. That evening Dr. Duggins called Dr. Sam Meade in consultation. They lanced the arm and continued the hot applications. They decided that insured should be sent to Kansas City to a hospital, which was accordingly done on Friday morning.

Dr. Neal, of Kansas City, was called to attend insured at St. Mary's hospital in that city and found insured critically ill; that he had a badly swollen and inflamed forearm, with a small opening caused by a scratch or cut. There was some evidence of consolidation of the lower right lobe of the lung. Dr. Neal lanced the place on insured's arm. "At the focus point" he observed some peculiar dots of pus of which he made "a smear" for microscopic examination and "a stab culture." The result of this culture was not known until after insured's death, which occurred on September 5, 1921,

from pneumonia, there having been a rapid progression to a fatal termination. Various laboratory analyses were made of the pus which showed a diplococcus of the non-capsulated type and staphylococci, this examination having been completed prior to insured's death. And after his death the culture was completed showing the presence of anaerobic germs. This is a germ which causes what is commonly known as blood poisoning. It multiplies in the subcutaneous part of the flesh and will not grow in the presence of oxygen.

The evidence shows that when insured left Slater he was suffering from blood poisoning or "acute septic intoxication," a general septicaemia (blood poisoning) on the evening of September 1st. In the opinion of one of the doctors, he was suffering at that time from pneumonia in the lower right lobe of the lung.

Dr. Neal testified that an anaerobic germ was a virulent poisonous germ; that it gains entrance into the system through a break in the skin. Dr. Mead testified that in his opinion insured received the infection through the cut on his left forearm. One of defendant's physicians testified that the percentage of recovery from septicaemia caused by anaerobic germs is very small. An examination of deceased's sputum showed the presence of the non-capsulated type of diplococcus; Dr. Neal testified that the non-capsulated type of diplococcus was practically harmless, that the capsulated type is the one that causes ordinary pneumonia. Defendant's physician testified that the true type of pneumonia is caused by pneumococci germs. Dr. Neal testified that pneumonia means any inflammation of the lungs no matter how caused; that in his opinion the pneumonia, which was the terminal cause of insured's death, was brought about primarily as the result of the infection of insured's arm. He explained in detail how the germ could be carried from the region of the cut in the arm to the lung and there set up inflammation causing pneumonia.

The policy begins by stating that "this policy provides indemnity for loss of life, limb, sight, and time by accidental means or of time by disease, as herein limited;" that it insured deceased—

". . . against loss resulting from (1) bodily injuries effected directly and independently of all other causes by accidental means (excluding self-destruction, or any attempt thereat, while sane or insane) and due solely to external, violent and involuntary causes, and leaving visible marks upon the body; and (2) disability from disease."

After several pages of printed matter intervening, the policy states under the head of "Additional Agreements" that—

"H. This policy does not cover death due to disease, whether acquired accidentally or otherwise."

The petition alleges that insured died as the result of bodily injury on his left forearm—

". . . which injury was effected directly independently of all other causes by accidental means (excluding self-destruction, or any attempt thereat while sane or insane) and due solely to external, violent and involuntary causes, which left visible marks on his body, to-wit, on his left forearm, namely, by lancing or cutting a pimple or lump on his left forearm with a razor, or other sharp instrument unknown to plaintiff, on which razor, or instrument, were deadly germs, whose presence thereon was unknown to said Carl C. Cameron, which were thereby injected into his said arm resulting in his," etc., death.

Defendant's first point is that its instruction in the nature of a demurrer to the evidence should have been sustained for the reason that—

". . . deceased did not die as the result of bodily injuries effected directly and independently of all other causes by accidental means and due solely to external, violent and involuntary causes."

In discussing this point defendant states—

"For the purposes of the argument it will be assumed that respondent satisfactorily showed in evidence that her deceased husband did voluntarily lance a pimple on his arm with a razor or other sharp instrument and that the germs of blood poisoning were introduced into his arm by such instrument and finally that this condition of blood poisoning so weakened his system as to induce lobar pneumonia from which he died. . . .

"Cameron the evidence showed, had a pimple on his arm, which caused him great annoyance. Evidently for the purpose of obtaining relief from this condition he undertook to perform a minor operation upon himself."

The argument in support of the point is based upon the proposition that as the cut was intentionally inflicted by insured upon himself and as the cut was the means or cause of the blood poisoning and subsequent death of the insured, there can be no recovery. There is some conflict in the decisions as to what is meant by "accidental means" within the meaning of an accident insurance policy. Some cases going so far as to hold that where the injury or death is the unusual, unexpected and unforeseen result of an injury intentionally made, such injury or death is by "accidental means," even though there is no proof of mishap, mischance or slip or anything out of the ordinary in the act or event which caused such injury or death. But the rule is now established in this State that "where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, where no mischance, slip, or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means; that it must appear that the means used was accidental, and it is not enough that the result may be

unusual, unexpected or unforeseen." [Caldwell v. Travelers' Ins. Co., 267 S. W. 907, 908.]

It seems that the leading authority on this question is that of Mutual Accident Ass'n v. Barry, 131 U. S. 100, 121, where certain language of an instruction reading, in part, as follows, was approved:

". . . that, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means."

We think there is no question but that if the insured in lancing or cutting the pimple on his arm unintentionally used an instrument having thereon an anaerobic germ, or germs, and that such germs were inserted into his system, that the occurrence was an accident within the meaning of the policy. He intended to cut himself but the insertion of the germs into his system was unintentional. There was testimony from which the jury might find that the pimple had been punctured by some instrument having upon it germs which resulted in blood poisoning. The evidence shows that before the cutting of the pimple the insured was a man forty years of age, strong physically and in good health. There is nothing in the evidence to suggest that he would intentionally do such an unnatural thing as to insert deadly germs into his system but, on the other hand, the presumption is to the contrary. There was testimony tending to show that the germs he inserted into his system caused the pneumonia from which he died and there is no question but that plaintiff is entitled to recover. [Lewis v. Ocean Accident and Guarantee Corporation, 120 N. E. (N. Y.), 56; Nax v. Travelers' Ins. Co., 130 Fed. 985; Lewis v. Iowa State Traveling Men's Ass'n, 248 Fed. 602; Interstate Business Men's Accident Ass'n v. Lewis, 257 Fed. 241; Aetna Life Ins. Co. v. Gas & Coke Co., 229 Fed. 552; Dezell v. Casualty Co., 176 Mo. 253; Lovelace v. Travelers' Protective Ass'n, 126 Mo. 104; Berryman v. Southern Surety Co., 285 Mo. 379.]

Defendant cites a great number of cases which tend to support the holding in this State as to what is meant by "accidental means." There is no dispute between the parties as to what is meant by those terms but the dispute here is in the inability of the parties to agree in applying the law to the facts. It is unnecessary to discuss all the cases cited by the defendant but taking up those cases having facts somewhat similar to those in the case at bar, we find cited the case of Fidelity & Casualty Co. v. Stacey's Executors, 143 Fed. 271. In that case the insured bruised and skinned his knuckles in

striking his opponent's teeth in a fight. The court specifically stated, at l. c. 273, that the infection causing blood poisoning from which insured died got into the skinned knuckles *subsequently* to the striking of his opponent. In Maryland Casualty Co. v. Spitz, 246 Fed. 817, the insured rubbed off a scab on the back of his neck, his hand being soiled with blood from chickens that he had been cleaning. An examination of this case shows that the question now under discussion sometimes turns on very close facts. In that case it was necessary to rub off the scab before any germ could be inserted, the accidental means was the intentional rubbing off of the scab, but it was only after the scab had been removed that the erysipelas germs entered. There was evidence that after insured rubbed off the scab, he used peroxide, realizing that he might have introduced germs into the abrasion. In discussing the point, the court laid stress on the fact that the insured knew that his hands were not clean when he rubbed off the scab, and stated that the deceased rubbed or scratched his neck in the ordinary way, there being no evidence that he was disturbed or interfered with during the operation; that the breaking of the scab was an ordinary and not an unusual result of what he did, and therefore, the rubbing or breaking off of the scab was not accidental. Ramsay v. Fidelity & Casualty Co., 223 S. W. 841, was a case where a demurrer to the petition was sustained. The petition alleging that a "port of entry" was made for bacteria by the pulling of insured's teeth by his dentist and *thereafter* bacteria entered. In Kendall v. Travelers' Protective Ass'n, 87 Ore. 179, a barber in removing ingrowing hairs from the chin of his customer at the latter's request, produced a wound that *afterwards* became infected.

Both parties herein attempt to gain comfort from the case of Caldwell v. Ins. Co., supra. That case involved facts entirely different from those in the case at bar, but it is asserted on both sides that the court in discussing numerous cases found in the opinion approved certain cases from other jurisdictions tending to support the respective contentions now made. Every case cited in that opinion in support of the position of the insurance company therein which was sustained, may be distinguished from the circumstances in the case at bar where they do not in fact appear to be similar to these circumstances. However, it does not seem to have been the purpose of the court necessarily to approve of the application of the facts discussed to the law laid down therein, but those cases were referred to more for the purpose of showing that they either had no application to the facts in the case under consideration or that they exemplified the position taken by the court in that case as to the rule therein adopted concerning the meaning of "accidental means" as used in accident insurance policies. However, the court did use language showing that it would approve of the application that we

have made of the law to the facts in the case at bar. At page 914 of the opinion in the Caldwell case, in discussing the case of Lewis v. Ocean Accident and Guarantee Co., supra, the court said—

"Insured died from infection, caused by puncture of a pimple. The opinion apparently considered the unexpected and unforeseen result as equivalent to accidental means and the mere fact of the puncture was held to be an accident, and the case lends some support to the contention of plaintiff in the case at bar. However, *the introduction of germs by reason of the puncture could well have been regarded as accidental means, even though the puncture was intentional.*" (Italics ours.)

And at page 913 of the opinion, in discussing Nax v. Travelers' Ins. Co., supra, the court said—

Insured died from blood poisoning following a self-inflicted knife cut while trimming a corn. In six lines the court held the injury was accidental, citing and relying on Western C. T. A. v. Smith, 85 Fed. 405. There was no discussion of the accidental result of an intentional act. In the Smith case insured suffered an abrasion of the skin from wearing new shoes. It was there held that the abrasion was unintentional and therefore accidental. It would seem to have been a question for the jury whether Nax intended to cut deeply enough to injure his toe, and if not, it was plainly a mishap.''

A similar suggestion to that made in the case at bar to the effect that the blood poisoning was a natural result of the use by insured of an unsterilized knife or sharp instrument and for that reason the result was not an accident, was answered in the case of Lewis v. Iowa State Traveling Men's Association, supra, l. c. 604, as follows:

"It cannot be assumed that the deceased knew that the cocci were upon the pin. There is no basis for the assumption that the deceased intentionally infected his lip. He did the act, which, as a matter of common knowledge, thousands do every year—he used a pin which he had at hand to open a pimple. I suppose it would be safe to say, as a matter of common knowledge, that not once in a thousand times does such use of a pin, even when no effort to sterilize is made, result in infection.''

So in the case at bar, we say that a deadly infection resulting from the cutting of a pimple is not usual.

It is insisted that the provision of the policy "that this policy does not cover death due to disease whether acquired accidentally or otherwise'' prevents recovery in this case for the reason that deceased died of a disease. Various definitions of disease were given by the physicians who testified in this case; one of defendant's physicians defined disease as—

". . . a physical condition which overcomes a person that would incapacitate them from performing their normal functions, would be a disease;" that traumatic pneumonia caused from a stab in the lungs would be a disease and that even a broken leg would be a disease. Webster defines disease as—

"Med. An alteration in the state of the body or of some of its organs, interrupting or disturbing the performance of the vital functions, or a particular instance or case of this; any departure from the state of health presenting marked symptoms; also, a specific kind of such alteration; a particular ailment or malady having special symptoms; as Addison's disease, Bright's disease, etc.; malady; affection; illness, sickness, disorder."

In the case of Cary v. Preferred Accident Ins. Co., 106 N. W. 1055. 1057 (Wisc.), the court said:

"Another exemption agreed upon by the parties, is that defendant should not be liable for death 'resulting, either directly or indirectly, wholly or in part, from . . . bodily infirmity or *disease of any kind.*' The facts as found exclude the idea that Mr. Cary was afflicted with any bodily infirmity or disease other than septicaemia induced by bacterial infection entering through the abrasion of the skin. The exemption manifestly cannot apply to this bodily infirmity or disease, the result of the accident; for, if it were treated as within the exemption, then it would be difficult to conceive of liability under any circumstances under insurance against effects of bodily injury caused solely by external, violent, and accidental means. In the very nature of things injury resulting from such an accident must be accompanied by some bodily infirmity in the general sense. and probably by disease in some form and degree, which in some measure contribute to the resulting disability or death." (Italics ours.)

The use in the case at bar of the words "disease whether acquired accidentallly or otherwise" is no broader than the words "disease of any kind" in the Cary case and what was said in that case applies very forcibly to the situation here. Defendant states in its brief, "Of course, it was not intended in the present policy that a broken leg should be regarded as a 'disease." With this admission it seems to us that the point falls. The construction to be given to this provision of the policy is that it means that the insurer was not to be liable for death due to disease acquired accidentally save through "bodily injuries effected directly and independently of all other causes by accidental means (excluding self-destruction, or any attempt thereat, while sane or insane) and due solely to external, violent and involuntary causes, and leaving visible marks upon the body." If this is the meaning, the facts in the case at bar do not come within the exceptions. [See, also, Summers v. Fidelity Mutual

Aid Ass'n, 84 Mo. App. 605; Rorabaugh v. Great Eastern Casualty Co., 200 Pac. (Wash.), 587.]

It is insisted that the court erred in refusing to give instructions stating to the jury that under the law of the State of Massachusetts defendant had an absolutely perfect defense and that to hold it liable in this suit would be to deprive it of property without due process of law and in violation of the Fourteenth Amendment of the Constitution of the United States and section 30 of article 2 of the Constitution of Missouri, and ending by peremptorily instructing the jury to return a verdict for the defendant. There are two Massachusetts cases pleaded and cited in the brief which it is claimed show that the law of Massachusetts would not permit a recovery in this case. These are the cases of Smith v. Travelers Ins. Co., 219 Mass. 147, and Leland v. United Commercial Travelers of America, 233 Mass. 558. A mere reading of these cases shows that they do not support defendant's contention but, on the contrary, shows that the rule in Massachusetts is the same as in this State. It is, therefore, unnecessary for us to decide whether the policy in the case at bar was a Massachusetts or a Missouri policy.

It is insisted that the court erred in refusing to allow defendant to appeal to the Supreme Court of Missouri; this is on the ground that a constitutional question is raised as to whether the trial court gave full faith and credit to the laws of Massachusetts. The full faith and credit provision of the Constitution of the United States is contained in section 1 of article 4, Constitution of the United States. Assuming that the constitutional question now urged is in good faith, the said provision of the Constitution was nowhere drawn to the attention of the trial court and for that reason there is now no constitutional question in the case (State v. Swift & Co., 270 Mo. 694; Lohmeyer v. Cordage Co., 214 Mo. 685), and the jurisdiction is here.

It is insisted that the court erred in giving plaintiff's instruction No. 1. This instruction in part tells the jury that if they believe—

". . . that on or about the 27th day of August, 1921, the said Carl C. Cameron received a bodily injury, effected directly and independently of all other causes, by accidental means, and due solely to external and violent and involuntary causes and leaving visible marks upon his body; and if you further find that said injury was caused by the lancing or cutting a pimple or lump on his left forearm with a sharp instrument; and if you further find that on such instrument were deadly germs and that the presence of said deadly germs were by said cut or cuts introduced or injected into the arm of said Carl C. Cameron; and if you further find that as a direct result thereof, if you so find, the said Carl C. Cameron was continuously totally disabled from the date of such injury; and if you fur-

ther find that on September 5, 1921, the said Carl C. Cameron died as the direct result of said injury,'' etc.

It is claimed that the instruction does not have the jury find that the introduction of the deadly germs by means of the cut was an accidental injury or that it was an injury due to external, violent and involuntary causes, but that part of the instruction in which the jury is directed to find that death was caused by accidental means, etc., was the cutting or lancing of the pimple. Also that it submitted to the jury as to whether the insured died as a direct result of the cut or injury when he did not die from the cut, the evidence showing that he contracted blood poisoning and pneumonia and that the latter caused his death. We think these criticisms are hypercritical. While the injury referred to in the instruction as being effected by ''accidental means,'' etc., was the injury of lancing or cutting the pimple, by a sharp instrument, the instruction goes on and has the jury find that if there were deadly germs upon the instrument whose presence was unknown to insured and such deadly germs were introduced or injected into the arm of insured, and as the direct result thereof, that is, of the cutting accompanied with the unknowing insertion of deadly germs into the arm, insured died, etc., their verdict should be for plaintiff. If the jury found all these facts, as a matter of law the death was brought about by accidental means. It was not essential that the instruction submit all the evidence as to the various stages of insured's illness, therefore, it was not necessary to directly submit that the germs caused blood poisoning and the latter caused pneumonia. It was not necessary to define the word disease within the meaning of the policy for the reason that if insured died as the result of the things submitted in the instruction, then his death did not come within the exception of the policy providing that defendant should not be liable for death from disease whether caused ''accidentally or otherwise.''

It is insisted that the court erred in refusing to give defendant's instruction to the effect that if insured died of lobar pneumonia, their verdict should be for defendant. The evidence shows that he died of lobar pneumonia and that disease was brought about by germs inserted into the arm when insured cut the pimple, therefore, the instruction was properly refused. Instruction H sought to submit to the jury that although germs were introduced into insured's system by the instrument used in cutting the pimple, and such germs caused blood poisoning and such blood poisoning weakened his physical resistance, resulting in pneumonia and that this pneumonia caused his death, their verdict should be for the defendant. This instruction was properly refused. [1 C. J. 452; Fetter v. Ins. Co., 174

Mo. 256; Driskell v. Ins. Co., 117 Mo. App. 362.] From what we have said, instruction F. was properly refused.

The original petition prayed for $5100 but this did not include interest. The jury allowed interest and the court permitted plaintiff to amend her petition after judgment to pray for interest. This is assigned as error. The court properly allowed the amendment. [Sec. 1277, R. S. 1919; McClannahan v. Smith, 76 Mo. 428; Lamb v. St. Louis Cable & Western Rd. Co., 33 Mo. App. 489, 492; 493; Meyer v. Schmidt, 130 Mo. App. 333, 339.]

The point is made in reference to the rejection of certain testimony offered by defendant but from what we have said it becomes apparent that this testimony was immaterial.

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.